FILED

IN THE FEDERAL COURT,
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

10 DEC 16  PM 2: 55

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

LINDA SCHWARTZKOPF

  Plaintiff,

Case No.: 8:10 CV 2815 17 tgw

JURY TRIAL AND INJUNCTIVE
RELIEF REQUESTED

vs.

ARGOSY EDUCATION GROUP INC. D/B/A ARGOSY UNIVERSITY
AND ARGOSY UNIVERSITY/ TAMPA AND ARGOSY UNIVERSITY/SARASOTA,
AND EDUCATION MANAGEMENT LLC.,

  Defendants.

_____/

**PLAINTIFF LINDA SCHWARTZKOPF'S COMPLAINT FOR AGE, GENDER AND DISABILITY DISCRIMINATION AND RETALIATION AND DEMAND FOR JURY TRIAL**

**COMES NOW**, Plaintiff LINDA SCHWARTZKOPF (hereinafter referred to as "Plaintiff"), by and through her undersigned counsel, and hereby sues Defendants ARGOSY EDUCATION GROUP INC., D/B/A ARGOSY UNIVERSITY AND ARGOSY UNIVERSITY/TAMPA AND ARGOSY UNIVERSITY/SARASOTA (hereinafter referred to as "Defendant Argosy Education"), EDUCATION MANAGEMENT LLC (hereinafter referred to as "Defendant EDMC"). All Defendants are collectively referred to as "Defendants") and states as follows:

### Introduction

1.    This is a proceeding for equitable relief, compensatory damages, pain and suffering front pay, back pay, liquidated, and/or punitive damages to redress continuous

TPA2522
$ 350

1

violations of 29 USC§2000e *et seq*, as amended by Federal Civil Rights Act of 1991 (hereinafter referred to as "Title VII"), 42 USC§12101 *et.seq.*, as amended by the ADA Amendments Act of 2008 (hereinafter referred to as the "Americans With Disabilities Act" or the ADA), 29 U.S.C.§621 *et.seq.*, (hereinafter referred to as the "Age Discrimination in Employment Act" or the "ADEA") and/or Florida Statute §760 *et. seq.* (hereinafter referred to as "Florida Civil Rights Act" or "FCRA") based on age, disability, gender and for retaliation.

2. Plaintiff seeks damages for the continuous course and pattern of discriminatory treatment and hostile environment taken against her by Defendants based upon her age, gender and/or disability, and for Defendants' continuing retaliatory actions against Plaintiff as a result of her complaints of discrimination.

### Jurisdiction and Venue

3. This court has subject matter jurisdiction by virtue of 42 U.S.C. §12101, *et. seq.*, and 42 U.S.C. §12117, which incorporates by reference §706 of Title VII of the Civil Rights Act of 1964, as amended; 29 USC§2000e-5(f)(3), 29 U.S.C §621 *et. seq.*, which incorporates by reference sections 16(b), 29 U.S.C.§216(b) of the Fair Labor Standards Act of 1938 and 29 U.S.C §626; 29 U.S.C. §2601 *et. Seq.*, §706 of Title VII and 29 U.S.C. §2617; 28 U.S.C. §2201 and §2202; 28 U.S.C. §1331 and §1343; and, by virtue of pendent jurisdiction, 28 U.S.C.§1367(a).

4. Venue is in the Tampa Division of the Middle District of Florida pursuant to 28 U.S.C. §1391(b) and 42 U.S.C. §2000e-5(f)(3) because events giving rise to Plaintiff's claims occurred in Hillsborough County, Florida, within this Division.

**Parties**

5.     Plaintiff is a sixty three year old female. Plaintiff is a United States citizen who is a resident of Pinellas County, Florida.

6.     Defendants employed Plaintiff from in or about May 2003 until Defendants retaliatorily refused to renew her employment contract and terminated Plaintiff on or about August 31, 2008. Defendant Education Management LLC is the parent company of Defendant Argosy Education Group Inc., d/b/a Argosy University and Argosy University/Tampa and Argosy University/Sarasota. Both Defendants are employers of Plaintiff. Plaintiff worked at Argosy University in Tampa, which is a fictitious named entity owned by Defendant Argosy Education, but Plaintiff's paychecks and employee handbook indicated her employer was Defendant EDMC. Plaintiff's handbook referenced Argosy University, owned by Defendant Argosy Education. Defendant Argosy Education's mailing address is c/o Defendant EDMC. Plaintiff's contract was with Argosy University/Tampa, a fictitious named entity owned by Defendant Argosy Education. Plaintiff's corporate email indicated her employer was fictitious entity, Argosy University, owned by Defendant Argosy Education. Plaintiff's Human Resource Department referenced Art Institute/Argosy/South Tampa Campus, all educational centers operated by Defendant EDMC. Upon information and belief, Defendants share an employee handbook, employee benefits, corporate and/or mailing offices, and three corporate officers. Defendants are joint employers of Plaintiff.

7.    Upon information and belief, Defendant Argosy Education d/b/a Argosy University And Argosy University/Tampa and Argosy University/Sarasota is a foreign Illinois corporation, registered in Florida, and is authorized to do and doing business in the State of Florida, with its principal place of business in Chicago, Illinois but its mailing address is c/o Defendant EDMC in Pittsburgh Pennsylvania, the same address as Defendant EDMC.

8.    Upon information and belief, Defendant EDMC is the parent company of Defendant Argosy Education d/b/a Argosy University And Argosy University Tampa and Argosy University/Sarasota and is a Delaware corporation, not registered to do business in Florida (registered in Pennsylvania) but doing business in Florida, with its principal address in Pittsburgh Pennsylvania, the same mailing address as Defendant Argosy Education.

9.    Defendants are engaged in a number of ventures, the relevant ventures to this case is educational institutions, specifically, selling educational classes and related products, to persons throughout Florida, including Hillsborough County, Florida and throughout the United States.  Defendants are among the largest providers of private post secondary education in North America and have approximately seventy-one (71) primary campus locations in North America and Canada.  Defendants are involved in interstate commerce.  Defendants operate schools known as the Art Institute, Argosy, South University and Brown Mackie College, which persons attend to advance their education and/or earn degrees.

4

## **Factual Background and Common Allegations**

10.   Plaintiff began working for Defendants as a part time Adjunct Professor in Hillsborough County in May 2003. Due to her hard work, intelligence and work ethic, Defendants promoted Plaintiff to full time Assistant Professor in Hillsborough County in or about January 2006.

11.   On or about August 31, 2008, due to her engaging in EEO protected activity and requesting reasonable accommodations for being disabled, Defendants terminated Plaintiff's employment.

12.   Plaintiff is intelligent, compassionate, dedicated and hard working. She was well respected by her peers and students, and despite her disability with reasonable accommodations, she was well qualified for her position as Assistant Professor with Defendants in its Florida School of Professional Psychology Department, to wit, its Bachelor of Arts in Psychology and Counselor Education Programs. Plaintiff holds a Doctorate of Education. She is both a National Certified Counselor and a National Certified School Counselor. Plaintiff worked in the Florida school system for approximately thirty years, including twenty-five years as a school guidance counselor. Plaintiff has held leadership positions in counselor organizations (both locally and state-wide) including positions such as President, VP Elementary, Editor, Secretary, Government Relations, and as Department of Education Liaison for the Florida School Counselor Association. Plaintiff also was the Past President of Pinellas County's Phi Delta Kappa Chapter. Plaintiff holds Certifications from the

Department of Education in Counseling, Early Childhood, Elementary Education, and Administration/Supervision.

13.   When Plaintiff began working for Defendants, she was not disabled and Defendants were very pleased with her performance. However, when Plaintiff became disabled and needed reasonable accommodations from Defendants, their supportive attitude and satisfaction toward her changed.

14.   During her employment with Defendants, Plaintiff was diagnosed with a serious heart ailment. She has had two heart catheterizations, heart ablation surgery, and wore a heart monitor. As a result of her heart condition, Plaintiff had a series of fainting spells, one of which caused a severe "exotic" fracture of her tibia plateau (leg). Plaintiff's exotic fracture resulted in the implantation of a plate and five pins in her leg, but such surgery caused only more serious medical impairments. Despite a number of surgeries/medical procedures (including back, knee and/or head repositioning procedures/surgeries) Plaintiff remains substantially limited in regards to her mobility, with serious neurological complications.

15.   While working for Defendants, after her leg surgery, Plaintiff was, at times, relegated to a wheel-chair, but, through hard work and significant rehabilitation, she has been able to progress to using a brace and/or cane to walk, albeit with a pronounced limp. Currently, Plaintiff uses a cane and still walks with a significant limp.

16.   During her employment with Defendants, Plaintiff also was diagnosed with diffused sympathetic dystrophy as a result of her leg injury. She also suffers from severe

allergies to the extent she must carry an EPI Pen to prevent anaphylactic shock and death.

17. Plaintiff was a well-qualified employee with a disability, who with reasonable accommodations could have, and still can perform the essential job functions of the teaching position she held with Defendants.

18. When Plaintiff became disabled and needed reasonable accommodations, Defendants' managerial hierarchy began a systematic campaign to force Plaintiff from the position she loved.

19. When Plaintiff complained to Defendants, they retaliated and began a campaign to humiliate her and force her resignation. When Defendants actions failed to result in Plaintiff's resignation, Defendants terminated her by refusing to renew her teaching contract, despite her qualifications and Defendants' need and vacancies.

20. During the relevant time period of Plaintiff's employment, her immediate supervisor was her Department Chair, Dr. Carrie Wilde, her Department Dean, Jeanne Peterson, and Defendants' President, Melanie Storms, all whom were within Plaintiff's direct reporting hierarchy. Defendants Human Resource Department was overseen by John Woolsey. At certain relevant times during Plaintiff's employment, Jennifer Correll was Plaintiff's Acting Department Chair and/or Director of Training; Dr. Andrew Ghillyer was Dean of Business and/or Vice President of Academic Affairs, and Ruth Semeslberger was Dean of Students Affairs and had some responsibility for ADA compliance.

21.    Upon information and belief, Plaintiff's managers are younger than Plaintiff and are not disabled.

22.    Defendants' managers made age, gender and/or disability based comments to and/or about Plaintiff.

23.    Due to her age, Defendants younger managers began a systematic campaign to refuse to provide Plaintiff with advancement, among other actions.

24.    Due to her disability, Defendants non-disabled managers began a systematic campaign to force Plaintiff from her position.

25.    Due to her gender, Defendants' management began a systematic campaign to refuse to provide Plaintiff with advancement, among other actions.

26.    Defendants engaged in a continuing pattern of age, gender and disability discrimination against Plaintiff. Specifically, Defendants subjected Plaintiff to a hostile work environment based on her disability, and treated her differently on the basis of age, gender and disability, including by refusing to promote or provide positions to Plaintiff for which she was qualified, and/or by repeatedly holding Plaintiff to higher standards than her younger/non-disabled counterparts, including by way of example only, as to room allocation, class assignment, evaluations, termination/contract renewal, promotions, policies, procedures, and performance. In conjunction with the differential treatment of Plaintiff, Defendants made age and gender discriminatory comments to and about Plaintiff and negative, offensive comments about her disability, her need for reasonable accommodations and questioned Plaintiff about her disability.

27. During these younger and non-disabled managers' supervision of Plaintiff, including Department Chair, Dr. Wilde, and Defendants' President Storms also began referring to Plaintiff in a derogatory and condescending manner, disregarding her ideas at meetings and refusing to provide her with reasonable accommodations, all due to her age and/or disability. Other Defendants' supervisors participated in these discriminatory actions against Plaintiff.

28. Defendants engaged in a pattern and practice of treating disabled persons differently and refusing to provide reasonable accommodations to disabled persons. Defendants' corporate culture included refusing to provide reasonable accommodations and making its facilities readily accessible to disabled persons.

29. Until near or about August 31, 2008, Plaintiff's discriminatory/retaliatory termination, President Storms and others belittled Plaintiff's disability and need for reasonable accommodations at meetings.

30. From on or about 2006 until Plaintiff's discriminatory/retaliatory termination, Defendants repeatedly harassed and discriminated against Plaintiff based on her disabilities and failed to provide her with reasonable accommodations. Defendants engaged in the following continuing pattern of harassment/discrimination, some or many of which occurred during the last 300/365 days of filing her EEOC/FCHR complaint, which by way of example only, include:

   *A.* In or about February 2008, Plaintiff asked for accommodations so she could attend her students' graduation, as did other Defendants' professors. Plaintiff explained she could not maneuver steps and described what occurred during

the previous year's graduation ceremony (2007) when she was forced to sit in the front row of the Theatre, alone, while all other professors were on stage. Even more offensive, in 2007, while sitting in the audience, Plaintiff was forced to endure students stepping on her and knocking over her cane while they walked toward the stage. In 2007, Plaintiff was so humiliated that she repeatedly asked in 2008 that Defendants ensure it make accommodations so she could attend the graduation ceremony on stage, along with the non-disabled professors. Defendants failed/refused Plaintiff's requests.

**B.**   Despite Plaintiff's requests to Human Resources, her Department Chair, Wilde, and President Storms about not having being provided accommodations at the 2007 graduation ceremony held at the Tampa Theatre, Defendants made a concerted decision to again hold the graduation ceremony at the Tampa Theatre, that has steps to the stage, but no ramps or elevators. Initially, Defendants' HR Department and its President assured Plaintiff that access to the stage was *not* limited to stairs. Plaintiff respectfully questioned these statements due to the fiasco that occurred during the 2007 graduation. Two days before the graduation ceremony, after another request by Plaintiff to ensure she could participate in the graduation ceremony, Defendants reluctantly disclosed that access to the stage depended on the use of stairs, but assured Plaintiff that Defendants had addressed her concerns and she would be able to participate in graduation, on stage. When Plaintiff arrived for the 2008 graduation, she found that Tampa Theatre did not have an elevator to the

stage; instead both the front and back entrances to the stage required the use of stairs. As she had informed Defendants, Plaintiff could only risk the narrow un-railed steps with substantial difficulty and substantial threat of further injury. Defendants failed to provide a portable ramp or electronic lift, so Plaintiff could access the stage.

C.    Although Defendants brought an "Evac Chair" to Tampa Theatre, it was apparent that none of Defendants' employees had read the directions because if they had, Defendants would have known that the Evac Chair is used only to *travel down stairs,* not up, hence the name. Defendants then indicated they would provide two persons to lift her and her wheelchair, up the narrow, no railing stairs. The two persons chosen to carry Plaintiff had no training, and one, an injured back. Plaintiff, justifiably scared, would not risk further injury relying on two untrained persons to attempt to lift her and her wheelchair up the stairs. When Plaintiff complained that the only way to maneuver the stairs safely was to crawl up the steps on her buttocks, Defendants' VP of Academic Affairs (VPAA) Dr. Ghillyer callously indicated that it was her choice. Humiliated, Plaintiff was again relegated to the audience. Plaintiff was so well respected by her students, that during both graduation ceremonies they yelled her name in an attempt to relieve her obvious embarrassment.

D.    Despite requests for reasonable accommodations and advance notice of access issues for the graduation ceremony, in 2007 & 2008 graduation ceremonies, Plaintiff was not given any handicap parking location nor was any

accommodations made for her.  Plaintiff was provided no handicap assessable parking, close to the mandatory meeting location.

E.      From in or about 2006, despite repeated requests by Plaintiff for first floor room assignments due to her obvious mobility issues, Defendants continued to assign Plaintiff to classrooms on upper level floors.  Only after Plaintiff included her physician's note and again pleaded for this reasonable accommodation, did Defendants reluctantly assign Plaintiff's classes to the first floor.

F.      After the onset of her mobility disabilities, Defendants repeatedly reminded Plaintiff that they could not promise continued classroom assignment to the first floor.  During this time frame, open classrooms were available on the first floor, and Plaintiff was wheelchair bound, or walked with the use of a cane and brace, therefore unable to climb steps without substantial difficulty and risk further injury.

G.      Throughout 2008, Defendants mandated holding Plaintiff's department's faculty meetings in a second story room of Defendants' building (approximately five persons attended said meetings).  Defendants refused to hold these meetings on the first floor to accommodate Plaintiff's disability, despite room availability.  Defendants refused, despite that Plaintiff and her physician made the request to assign her classes to the first floor, including due to her mobility issues and that Plaintiff had been stranded on the second floor during emergencies/fire evacuations, or forced to risk her life taking the

elevator during evacuations (despite that elevators are not to be used during fires/emergencies).

**H.** In 2008, Defendants purchased an Evac Chair.  Despite Plaintiff's request, Defendants refused to allow her to participate in the "hands-on" training by the Evac Chair's expert, as were Defendants' other non-disabled employees. Instead, Plaintiff was only allowed to read the materials and review a five-minute video (after she requested such information) on the Evac Chair's use.

**I.** In 2008, Defendants' employees could not and did not answer Plaintiff's questions about the Evac Chair during her review of the video.  Since Plaintiff would be the one placed in the chair and forced to rely on the training of Defendants' employees for correct use of the Evac Chair, one would expect she be permitted to attend training with the expert, ask questions, and gain confidence with the employees' training, especially considering the chairs directions recommend the disabled individuals participate in the training.

**J.** When Defendants provided the Evac Chair training tape to personnel (who were not allowed to engage in the actual "hands-on training"), jokes and inconsiderate comments were made about disabled persons, again causing Plaintiff discomfort, alienation, and embarrassment all due to her disabilities, conditions over which she had no control.  Defendants' management made no attempt to stop these insensitive comments, and participated in same.

**K.** Throughout Plaintiff's employment, Defendants' building was not in compliance with ADA's accessibility requirements.    For example,

Defendants' building entrance (located on a steep incline) initially did not have electric doors; these doors were not installed until Plaintiff repeatedly requested installation due to the lack of access for wheelchair bound employees and students.

*L.* After the onset of her mobility disabilities, Defendants refused to provide Plaintiff with a key to the main interior door entrance (which other employees were given) despite that she had early morning weekend classes and numerous times during these class periods, no one timely arrived to allow her access to the building.  Plaintiff was forced to sit outside in her wheelchair, or to stand with her cane/brace and wait for access (which building entrance was located on a steep incline).  Defendants informed Plaintiff that she would have to wait for a key until a number of key requests were submitted, as Defendants did not order one key at a time.

*M.* While in a wheelchair, Plaintiff could not access the bathroom stalls, as they were too narrow.  She was forced to leave her wheelchair outside the stall and hope no one moved it while she was inside (which happened on a number of occasions, forcing Plaintiff to call out for help as others had moved her chair or blocked the stall doorway so she could not exit).

*N.* While in a wheelchair, Plaintiff could not reach the paper-towel dispenser in Defendants' restrooms, as it was placed too high for wheelchair bound persons.    While   in   a   wheelchair,   Plaintiff   repeatedly   requested

accommodations but such requests were ignored or met with resistance and extreme displeasure.

**O.**      Post onset of her disabilities, Defendants refused to provide Plaintiff's department with sensitivity training relating to disabled persons despite discriminatory and/or offensive comments made by Defendants' management/employees and despite requests by Plaintiff.

**P.**      Since the onset of her disabilities, Defendants' employees/managers repeatedly made comments including comments about Plaintiff's disability and the Evac Chair. For example, in February 2008, during a faculty meeting, Dr. Wilde, in an exasperated and rude tone of voice, stated that the Evac Chair was bought for Plaintiff and "people like her" and that it was "very expensive." Dr. Wilde made a number of these same discriminatory comments throughout 2008. Unfortunately, Plaintiff was present during these embarrassing comments and felt unnecessarily singled out due to her disability.

**Q.**      During her employment, a disabled student asked Plaintiff for assistance with her disability, she referred the student to Defendants' designated ADA Representative, Ruth Semelsberger. Ms. Semelsberger rudely asked Plaintiff if she was recruiting ADA persons.

**R.**      In or about the week of January 20, 2008, Plaintiff offered to assist her Chair, Dr. Wilde, while another Professor, Dr. Correll, was on a leave. Dr. Wilde refused to respond to Plaintiff's offer. When Plaintiff inquired further as to

why her offer to assist was not accepted, Dr. Wilde responded that it was due to her "health".

S.    In or about February 2008, Plaintiff was at a faculty meeting when she began fearing an allergic reaction to a strong odor in the room (perfume). Plaintiff asked for the door to be left open to prevent her from having a severe allergic reaction. Instead, Plaintiff's Department Chair, Dr. Wilde, got up from her seat and forcefully pushed the door closed. Plaintiff began having an allergic reaction and had to leave the room to administer medicine. When she returned, Plaintiff explained she couldn't return to the room with the door closed in that she was attempting to avoid going into anaphylactic shock and having to give herself an EPI pen shot, which often requires hospitalization. Dr. Wilde merely responded that the door could not be left open. It was not until another professor suggested that Plaintiff be allowed to call from her office that Dr. Wilde reluctantly allowed Plaintiff to so do. Dr. Wilde displayed no concern for Plaintiff's health or her need for reasonable accommodation.

T.    From 2007 through 2008, Dr. Wilde refused to allow Plaintiff to take off any Fridays for medical procedures etc, unless she provided medical documentation and received Dr. Wilde's advance approval. Dr. Wilde required this from Plaintiff despite the fact that Plaintiff confirmed with Argosy's VPAA that written documentation was not a required policy for medical appointments. Also, other non-disabled employees were not required

to provide this same documentation in order to take a day off or to use such a day for professional development. For example only, on or about November 1, 2007, Plaintiff submitted her needed days off, including Friday, February 1ˑ 2008 for a scheduled medical appointment. On January 22, 2008, almost three months later, Dr. Wilde, notified Plaintiff that she could not have February 1, 2008 off, as another (younger, non-disabled) professor needed the day to accommodate her second job, as a self employed counselor.

*U.*    In or about September 2007, while Plaintiff was recuperating from a hospital stay, Dr. Wilde refused to grant Plaintiff's request that for a limited time period, she be allowed to attend/oversee her graduate counseling level practicum class, via telephone conference, despite that Defendants allowed other non-disabled professors to attend their classes via telephone conference. During same time period, Dr. Wilde herself taught one of her classes via telephone for a short period, while she was in Hawaii at a conference. Plaintiff's class was set in a designated conference room equipped with telephone conference capabilities as students who resided at least fifty miles away from the facility were allowed to attend this very class via telephone. Plaintiff's class focused on student discussion, which lends well to conferencing yet Defendants denied Plaintiff's request. Instead of accommodating Plaintiff's disability, despite that Plaintiff already had begun teaching this class, Defendants removed this class from her caseload and assigned the class to a younger, non-disabled professor with no school

counseling experience/qualifications as prescribed by the Florida Department of Education.

V.      During her employment, Defendants disclosed confidential medical information about Plaintiff. For example, when Defendants replaced Plaintiff with another teacher, Defendants disclosed detailed information about Plaintiff's medical condition to the students and made negative comments about Plaintiff's professional abilities. Students were required to promise not to disclose the comments made by Defendants.

W.      In or about September 2007, Defendants refused to allow Plaintiff to teach another class in Tampa, for which she was scheduled, due to Plaintiff having to take an eight (8) day leave for her disability and her resulting medical needs. Despite Plaintiff being able to teach this class, with reasonable accommodation as to its location (first floor assignment) and despite her having significant experience with the relevant material, Defendants refused Plaintiff's request, assigning a substitute professor for the second class, and finally transferring the class to another professor who was younger and not disabled, but who taught full-time at Defendants' Sarasota Campus.

X.      In or about 2007, Defendants refused to consider Plaintiff for the Director of Training position. Plaintiff's supervisor, Chair, Dr. Wilde told Plaintiff that she wasn't qualified and would not be considered for the job. When Plaintiff asked how Dr. Teufel was more qualified than she was, Dr. Wilde responded, that Dr. Teufel lived in the area. Plaintiff responded that she lived in the area

for forty-two (42) years, but received no response from Dr. Wilde. Plaintiff was qualified for such position but instead Defendants hired Dr. Teufel, a non-disabled younger person, who did not have a doctorate degree.

Y.     In or about fall 2007, Defendants' B.A. Psychology Program was being aligned with its Psychology Department instead of the Counseling Department and Defendants were to hire a person to oversee the program. However, in the interim. Plaintiff was expected to, and did, continue to perform the duties of this new position without additional compensation; and

Z.     From the onset of her disabilities, Plaintiff's supervisors began speaking to or about Plaintiff in a derogatory and/or condescending manner, scoffing at her suggestions, failing to invite her to meetings or scheduling department meetings (attended by only the few department employees) during known conflicts with Plaintiff's schedule, failing to discuss issues with Plaintiff, and disregarding her ideas.

31.     From in or about fall 2006 until around the date of her discriminatory/retaliatory termination, Defendants repeatedly discriminated against Plaintiff based on her age. Defendants engaged in the following continuing pattern of harassment/discrimination, some of which occurred during the last 300/365 days of filing her EEOC/FCHR complaint, which by way of example only, include:

A.     From March 2007 until in or about April 2008, Plaintiff's Chair, Dr. Wilde repeatedly stated that Defendants' faculty needed to resemble their student

population regarding age (students were predominantly young, to wit, less than forty).

**B.**     From in or about March 2007 until in or about April 2008, Dr. Wilde would further indicate they needed younger professors in the department.

**C.**     From in or about late 2006 until around her Plaintiff's termination, Defendants repeatedly spoke in a condescending manner, disregarded or scoffed at her suggestions, and treated her differently as to teaching and policies, based on her age.

**D.**     In or about fall 2007, Defendants' B.A. Psychology Program was being aligned with its Psychology Department instead of the Counseling Department and Defendants were to hire a person to oversee the program. However, in the interim. Plaintiff was expected to, and did, continue to perform the duties of this new position without additional compensation; and

**E.**     In or around spring of 2008, Defendants hired a young male, Chris Hull for Plaintiff's Department. Chris Hull was a male, under forty and did not have his doctorate. In comparison Plaintiff was sixty (60) years of age, a female, and had a doctorate, and

**F.**     Defendants hired Dr. Teufel, for the Director of Training Position. Dr. Teufel was approximately thirty years of age, significantly younger than Plaintiff. When hired, Dr Teufel did not have her doctorate, as did Plaintiff. However, Defendants refused to consider Plaintiff for this position despite her positive performance and extensive qualifications. In fact, Plaintiff was more qualified

than Dr. Teufel.  Plaintiff had more experience, more practical training and a stronger educational background than Dr. Teufel, the younger person chosen for this position.

32.  From in or about fall 2006 until around the date of her discriminatory/retaliatory termination, Defendants repeatedly discriminated against Plaintiff based on her gender.    Defendants  engaged  in  the  following  continuing  pattern  of harassment/discrimination, some of which occurred during the last 300/365 days of filing her EEOC/FCHR complaint, which by way of example only, include:

A.  Plaintiff's Chair, Dr. Wilde made comments about needing to hire males and needing more male employees.

B.  Defendants' manager (VPAA) referring to Plaintiff as a girl and that Plaintiff was fighting like teenage girl fight.

C.  Defendants hired a young male, Chris Hull for Plaintiff's Department.  Chris Hull was a male who did not have his doctorate.  In comparison Plaintiff was a sixty (60) year old female, who had significantly more educational experience, teaching experience, and more advanced education, including a doctorate, than the male, Chris Hull, who was hired by Defendants, and

D.  In or about fall 2007, Defendants' B.A. Psychology Program was being aligned with its Psychology Department instead of the Counseling Department and Defendants were to hire a person to oversee the program.  In the interim. Plaintiff was expected to, and did, continue to perform the duties of this new position yet received no additional compensation as promised.

33.    When Plaintiff complained about failing to accommodate her disability on or about March 2007, Defendants engaged in a pattern of retaliatory conduct, which started with Defendants Chair, Dr. Wilde, becoming more antagonistic toward Plaintiff, refusing to address Plaintiff's accessibility concerns, VPAA, HR representative being rude and aggressive toward Plaintiff, and Defendants' management accusing Plaintiff of refusing to communicate and being insolent with her supervisors.

34.    As a result of Defendants' actions, Plaintiff feared for her job and determined she had to remain silent or risk termination.  Based on her disabilities and resulting wheel-chair bound status, Plaintiff knew how difficult obtaining new employment would be, so unable to risk job loss, she stop formally complaining.  However, in or about January 2008, Plaintiff could no longer suffer in silence.  Risking her job, Plaintiff complained in January 2008 and again in March 2008.  Within days, Defendants again began engaging in a campaign of retaliatory conduct, which started with Defendants continued with a number of adverse and increasingly humiliating actions, including refusing to allow Plaintiff to teach overload classes and accusing Plaintiff of poor communication, and culminated in Defendants refusing to promote/transfer Plaintiff, address her EEO complaints, humiliating her in the presence of her students and colleagues, and terminating her employment.

35.    After Plaintiff complained, Defendants engaged in the following continuing pattern of retaliation against Plaintiff, some of which occurred during the last 300/365 days of filing her EEOC/FCHR complaint, which by way of example only, include:

*A.*   In or about January and March 4, 2008, Plaintiff complained of differential treatment to Defendants, including to HR, the VPAA and President. As a result, in February, approximately three/four weeks from her complaint about differential treatment, Dr. Wilde refused to allow Plaintiff to teach any overload classes for the 2008/2009 years, instead telling Plaintiff that Defendants were keeping the classes unassigned in case a new professor was hired.

*B.*   On or about March 12, 2008, within approximately nine (9) days of Plaintiff engaging in EEO protected activity, specifically, on March 12, 2008, Tara Cameron (HR) and Dr. Wilde held a meeting with Plaintiff. The tone of the meeting was hostile and degrading. Dr. Wilde accused Plaintiff of poor communication, matters directly addressed by Plaintiff in her March 4, 2008 EEO protected complaint.

*C.*   On or about March 10, 2008, within days of Plaintiff's EEO protected complaint, including the complaint made against her Chair, Dr. Wilde denied Plaintiff her requested vacation days, including a day that already passed, specifically, February 29, 2008.

*D.*   Post complaint, Defendants again began threatening to and did hold meetings and assigning classes to Plaintiff on top floors instead of the first floor, as requested by Plaintiff and her physician.

*E.*   In or about spring 2008, Dr. Wilde assigned a Research Class to Plaintiff despite her repeated request not to teach this class. When Plaintiff asked why Professor Diane Perry couldn't teach the research class, Dr. Wilde indicated that Diane

Perry allegedly said she didn't have the expertise to teach the class. Plaintiff indicated her surprise as Diane Perry had taught all or almost all classes, and asked if she could contact Diane Perry to see if she could assist her in any areas where she was not comfortable. Dr. Wilde forbade Plaintiff from addressing the matter with Diane Perry and refused to consider any other professor to teach the class.

F.    On or about March 28, 2008, within weeks of Plaintiff engaging in EEO protected activity, Defendants notified Plaintiff that her teaching contract was not being renewed, despite her positive employment.

G.    Less than four weeks after Plaintiff's second written complaint of discrimination, Defendants terminated Plaintiff, effective August 31, 2008.

H.    In late 2007 or early 2008, Plaintiff was informed by Defendants' Sarasota campus that they wanted to hire/transfer Plaintiff to the Sarasota location due to her expertise in needed areas. Plaintiff met with the Chair at the Sarasota campus and received positive endorsements of her transfer. In addition, the Sarasota Chair told Plaintiff that they wanted her to teach "overload" courses for the summer, and that she should expect her contracts to be mailed to her. After Plaintiff complained of differential treatment in January and March 2008, Sarasota personnel ceased responding to Plaintiff.

I.    In the weeks after complaining about discrimination, Defendants refused to transfer/promote Plaintiff despite having vacancies for which Plaintiff was plainly qualified.

*J.* Plaintiff was told by a prior student that Defendants were telling persons that Plaintiff no longer worked at Argosy University as she didn't meet the accreditation requirements, which was and remains false.

*K.* At a convention in the summer 2008, Plaintiff met the Sarasota Campus Chair who told Plaintiff that Defendants' HR instructed Sarasota personnel that they could not hire Plaintiff despite their desire and need for her services. As late as Plaintiff's filing of her EEOC/FCHR Charge and thereafter, these positions were still open and being advertised by Defendants.

*L.* Defendants refused to hire Plaintiff for the Argosy Sarasota campus, despite vacancy;

*M.* Defendants ignored Plaintiff, acted rudely and aggressively to Plaintiff, reduced communications with Plaintiff and attempted to prevent Plaintiff's involvement with meetings and other issues; and

*N.* Defendants refused to appropriately investigate Plaintiff's EEO Complaint.

36. Plaintiff made efforts to resolve her EEO complaint. Plaintiff repeatedly contacted her chain of command and Defendants' HR Department, including via correspondence, imploring Defendants to take action and rectify the discrimination and retaliation to which she was being subjected. Although Plaintiff contacted HR imploring it to investigate her complaints, Defendants refused to investigate and/or appropriately investigate. Defendants allowed the discrimination and retaliation to remain unabated.

37.    The persons of and to whom Plaintiff complained were the decision makers and/or
       actively involved in many of these retaliatory actions, including, but not limited to,
       President Storms, Department Chair, Dr. Wilde and VPAA Dr. Ghillyer.

38.    During all relevant periods of times, Plaintiff received positive accolades from her
       fellow professionals, some members of management and her students.

39.    Defendants' alleged investigation was mere pretense.  Defendants failed to engage in
       a good faith investigation.  Plaintiff's complaint remained un-addressed, her concerns
       only heightened.  Defendants merely dismissed Plaintiff's concerns and took actions
       designed to silence Plaintiff. Defendants denied any discrimination had occurred.  No
       explanation was provided.  No discussion allowed.

40.    Defendants determined to terminate Plaintiff, a long-term successful older, disabled
       female, teacher, within weeks after she engaged in EEO protected activity.

41.    Defendants' actions caused Plaintiff to suffer extreme stress and humiliation.

42.    From on or soon after Plaintiff's diagnosis of disabilities and continuing until on or
       about Plaintiff's discharge, Defendants subjected Plaintiff to a continuing pattern of
       disability discrimination. Defendants created a hostile work environment due to
       Plaintiff's disability/handicaps and discriminated against and failed to reasonably
       accommodate Plaintiff's handicaps/disabilities,

43.    From soon after Plaintiff began being supervised by Dr. Wilde, approximately fall
       2006 and continuing until on or about the time of Plaintiff's discharge, Defendants
       subjected Plaintiff to a continuing pattern of age and/or gender discrimination.

Defendants further engaged in a continuing pattern of retaliatory actions after Plaintiff complained.

44. On or about August 6, 2008, Plaintiff filed a Charge of Discrimination with both the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR"), alleging a continuing pattern of age, disability discrimination, gender and retaliation. A copy of said Charge is attached, incorporated by reference, and marked as **Exhibit "A."**

45. When Plaintiff realized her Charge didn't reflect all her complaints, Plaintiff supplemented, clarified and updated her Charge in mid 2008, October 2008 and November 2008, which information supplemented, related back and arose out of her original Charge. Plaintiff merely provided more detailed allegations of disability age and gender discrimination. Copies are attached, incorporated by reference, and marked as **Exhibit "B."**

46. On September 20, 2010, the EEOC issued Plaintiff a Notice of Right to Sue. A copy of Plaintiff's Notice of Right To Sue is attached, incorporated herein by reference, and marked as **Exhibit "C."**

47. The discriminatory actions taken against Plaintiff by Defendants' management are part of a continuous pattern of discrimination.

48. The retaliatory actions taken against Plaintiff by Defendants' management are part of a continuous pattern of retaliation.

49. Plaintiff's Charge of Discrimination was timely filed with the EEOC and the FCHR in that the conduct of Defendants constituted a continuing violation or continuing

wrongs such that the limitations period for all of its conduct is properly satisfied by Plaintiff filing her Charge within 300/365 days of the last act of discrimination and retaliation by Defendants.  The continuing conduct of Defendants was a part of an ongoing course of discriminatory and retaliatory actions by Defendants.

50.     Plaintiff timely filed his federal Complaint of Discrimination in that she filed such complaint within 90 days of receipt of her right to sue letter from the EEOC.

51.     FCHR has not investigated the Charge nor issued any independent FCHR determination on Plaintiff's Charge.

52.     Plaintiff timely filed her Complaint of Discrimination with this Court.

53.     As described herein, Defendants' actions were done intentionally, willfully, wantonly, and with an utter disregard for whether its actions violated the law and Plaintiff's civil rights.  Defendants' actions warrant punitive and/or liquidated damages.

54.     Plaintiff is suffering and will continue to suffer irreparable injury and damages and monetary damages as a result of Defendants' discriminatory and retaliatory actions. As a result of Defendants' aforementioned actions, Plaintiff has sustained significant damages in the form of lost wages and will continue to sustain such damages in the future.  Among other damages, Plaintiff also suffered loss of benefits, bonuses and future wages/bonuses.

55.     As a result of Defendants' aforementioned actions, Plaintiff has sustained significant damages such as severe emotional and mental anguish, pain and suffering.

56.     Plaintiff has retained the undersigned attorneys to represent her in this action and has agreed to pay reasonable fees for their services.

57.     Plaintiff has exhausted all necessary administrative remedies and/or said remedies have proved unavailing.

**COUNT I**
**FEDERAL CLAIM - DISABILITY DISCRIMINATION,**
**FAILURE TO REASONABLY ACCOMMODATE**
**42 U.S.C.§12101 *et. al* - AMERICANS WITH DISABILITIES ACT**

58.     Plaintiff re-alleges and incorporates her allegations set forth in ¶¶1 through ¶¶18, ¶¶20 through ¶¶22, ¶24, ¶¶26 through ¶¶30, ¶33, ¶34, ¶38, ¶¶40 through ¶¶42, ¶¶44 through ¶¶47, ¶49, ¶50 and ¶¶52 through ¶57 hereof, as if fully set forth herein.

59.     At all times material hereto, Defendants have been doing business and are employers with fifteen or more employees for each work day for twenty or more calendar weeks in the current or preceding calendar years and within the meaning of the ADA.

60.     At all times material hereto, Defendants were Plaintiff's employer as that term is defined by ADA.

61.     At all material times hereto, Plaintiff was an employee of Defendants as that term is defined by ADA.

62.     Plaintiff's disabilities are impairment(s) that substantially limit one or more of her major life activities, or in the alternative, Plaintiff's disabilities have caused Defendants to regard her as having a disability/handicap that substantially limit one or more major life activities.  Plaintiff's disabilities are disabilities/handicaps as defined by the ADA.

63.     At all relevant times, Plaintiff was/is a qualified employee with a disability/handicap who, with reasonable accommodations, could perform the essential functions of her job for Defendants.

64.     As a person with a disability/handicap, as described herein, both Plaintiff and/or her physicians requested reasonable accommodations for Plaintiff such that she could perform the essential job duties as a professor for Defendants.

65.     Defendants had an obligation to reasonably accommodate Plaintiff such that she could perform the essential job functions of her position.  Defendants were aware of Plaintiff's disability/handicap and her need for reasonable accommodations. Plaintiff's accommodation requests were reasonable.

66.     Defendants failed and/or refused to reasonably accommodate Plaintiff's disability/handicap, as previously delineated herein, including but not limited to room assignments, derogatory comments about her disability, need for reasonable accommodations and the Evac Chair, graduation ceremonies, Evac chair training, meeting locations, opening a door when Plaintiff was having an allergic reaction to perfume, key allocation, refusing to engage in sensitivity training, refusing telephonic class attendance, refusing to provide readily accessible accommodations in bathrooms, doorways and other common areas, and/or refusing to approve physicians appointments or requiring notes for same, not required of other employees.

67.     Defendants engaged in a corporate culture of failing to accommodate employees and failing to make public accommodations readily accessible to students, employees and the public at large.

68.     Defendants' actions as described herein were in violation of the ADA.

        **WHEREFORE**, Plaintiff prays for a judgment against Defendants for the following damages:

A.      Compensatory damages, including damages for mental anguish, pain and suffering, emotional anguish and distress;

B.      Punitive damages;

C.      Interest;

D.      Attorney fees;

E.      Costs including expert fees;

F.      Injunctive relief, if applicable;

G.      Any and all other relief this Honorable Court deems just.

**COUNT II**
**STATE CLAIM - HANDICAP DISCRIMINATION,**
**FAILURE TO REASONABLY ACCOMMODATE,**
**FLORIDA CIVIL RIGHTS ACT OF 1992**
**FLORIDA STATUTE §760 *et. seq.,***

69.    Plaintiff re-alleges and incorporates her allegations set forth in ¶¶1 through ¶¶18, ¶¶20 through ¶¶22, ¶24, ¶¶26 through ¶¶30, ¶33, ¶34, ¶38, ¶¶40 through ¶¶42, ¶¶44 through ¶¶47, ¶49, ¶50, ¶¶52 through ¶¶57, ¶¶62 through ¶¶67, hereof, as if fully set forth herein.

70.    At all times material hereto, Defendants have been doing business and is an employer with fifteen or more employees for each work day for twenty or more calendar weeks in the current or preceding calendar years and within the meaning of FCRA.

71.    At all times material hereto, Defendants were Plaintiff's employer as that term is defined by FCRA

72.    At all material times hereto, Plaintiff was an employee of Defendants as that term is defined in FCRA.

73.   At all relevant times, Plaintiff was a qualified employee with a disability/handicap.

74.   Plaintiff's disabilities, as described herein, are disabilities/handicaps as defined by the FCRA and were illnesses, injuries, or impairments that involved continuing treatment by a health care provider and qualified as serious health condition(s).

75.   As described herein, Defendants' actions violated the FCRA

76.   The FCHR has issued no determination on this case independent, separate and apart from the cause determination issued by the EEOC.  180 days have passed since Plaintiff filed her initial Charge of Discrimination with the FCHR.

**WHEREFORE**, Plaintiff prays for a judgment against Defendants for the following damages:

A.   Compensatory damages, including damages for mental anguish, pain and suffering, emotional anguish and distress;

B.   Punitive damages;

C.   Interest,

D.   Attorney fees;

E.   Costs including expert fees;

F.   Injunctive relief, if appropriate;

G.   Any and all other relief this Honorable Court deems just.

## COUNT III
## FEDERAL CLAIM – DISABILITY DISCRIMINATION/HOSTILE WORK ENVIRONMENT - 42 U.S.C.§12101 *et. al* - AMERICANS WITH DISABILITIES ACT

77.   Plaintiff re-alleges and incorporates her allegations set forth in ¶¶1 through ¶¶18, ¶¶20 through ¶¶22, ¶24, ¶¶26 through ¶¶30, ¶33, ¶34, ¶38, ¶¶40 through ¶¶42, ¶¶44

through ¶¶47, ¶49, ¶50, ¶¶52 through ¶¶57, ¶¶59 through ¶¶68, and ¶73 hereof, as if fully set forth herein.

78. Defendants' management discriminated against Plaintiff because of their preconceived and unsubstantiated fears concerning Plaintiffs' work abilities and/or Defendants' management unjustifiably feared that Plaintiff's disability/handicap would prevent her from performing her job duties and/or because Defendants disliked having to work with handicapped persons and/or because Defendants' management did not want to reasonably accommodate a handicapped/disabled person, as required by law.

79. From on or about the onset of her medical conditions/disabilities and continuing to after her termination, Defendants' management supervising Plaintiff, took discriminatory actions against Plaintiff due to her disability/perceived disability, including but not limited to the following: 1) Failing to reasonably accommodate Plaintiff's disability, despite requests; 2) Fail.ing to provide Plaintiff with raises and/or appropriate bonuses; 3) Unfairly and inappropriately reducing Plaintiff's classes and therefore her income 4) Refusing to promote Plaintiff; 5) Ignoring Plaintiff and her ideas, including but not limited to, holding meetings without Plaintiff and subjecting Plaintiff to embarrassment and ridicule; 6) Refusing to transfer/promote Plaintiff to Sarasota; 7) Unfairly scrutinizing Plaintiff's performance of her daily activities, refusing vacation days and/or physician appointments, and/or requiring notes from physicians not required of other professors, questioning Plaintiff's use of leave time; 8) Terminating Plaintiff; 9) Refusing to assign Plaintiff

to lower level classrooms, refusing to assign Plaintiff to specific classes or assigning Plaintiff to classes she asked not to teach 10) Refusing to provide Plaintiff with keys to buildings, refusing to provide reasonable access to readily assessable restrooms and rooms, or elevator/lifts for participation in graduations and/or refusing to hold meetings in accessible locations; 11) Failing to provide Plaintiff with handicap parking spaces or assistance with parking during graduation; 12) Failing to inform Plaintiff of necessary information she needed to perform her job; 13) Unfairly and falsely questioning Plaintiff's skills, including communication skills, making negative and discriminatory comments about Plaintiff's disability or need for reasonable accommodations or the Evac Chair; 14) Refusing to provide Plaintiff with the ability to attend graduation on stage as did the other professors 15) Refusing to allow Plaintiff to assist in certain projects and refusing to allow Plaintiff to teach class telephonically as were others; 16) Accusing Plaintiff of having poor communication skills and employee relations; 17) Treating Plaintiff rudely and speaking to her in a condescending tone; 18) Refusing to hold sensitivity training; and19) Disclosing confidential medical information.

80.    Defendants disclosing her disability to persons who had no need to know of Plaintiffs disabilities, which violated confidentiality and was inappropriate. Such disclosure created unnecessary tension between Plaintiff, fellow staff and her students and violated the confidentiality provisions of the ADA, as well as the FCRA

81.    Defendants did not treat similarly situated professors who were neither disabled nor perceived as disabled, similarly.

82.     Defendants took the actions against Plaintiff, described herein, due to her disability/perceived disability, in violation of the ADA.

83.     Defendants' actions affected the terms, conditions and privileges of Plaintiff's employment, including but not limited to, her financial terms and her job and its duties.

**WHEREFORE**, Plaintiff prays for a judgment against Defendants for the following damages:

A.      Compensatory damages, including damages for mental anguish, pain and suffering, emotional anguish and distress;

B.      Punitive damages;

C.      Lost pay, including lost raises and bonuses;

D.      Benefits;

E.      Front pay;

F.      Interest,

G.      Attorney fees,

H.      Costs including expert fees;

I.      Injunctive relief, if applicable;

J.      Any and all other relief this Honorable Court deems just.

**COUNT IV**
**STATE CLAIM–HANDICAP DISCRIMINATION–HOSTILE WORK ENVIRONMENT-FLORIDA STATUTE §760, FLORIDA CIVIL RIGHTS ACT 1992**

84.     Plaintiff re-alleges and incorporates her allegations set forth in ¶¶1 through ¶¶18, ¶¶20 through ¶¶22, ¶24, ¶¶26 through ¶¶30, ¶33, ¶34, ¶38, ¶¶40 through ¶¶42, ¶¶44

through ¶¶47, ¶49, ¶¶51 through ¶¶57, ¶¶62 through ¶¶67, ¶¶70 through ¶¶76, ¶¶78 through ¶¶81 and ¶83 hereof, as if fully set forth herein.

85.     Defendants took the actions against Plaintiff described herein due to her disability/perceived disability in violation of the FCRA.

**WHEREFORE**, Plaintiff prays for a judgment against Defendants for the following damages:

A.     Compensatory damages, including damages for mental anguish, pain and suffering, emotional anguish and distress;

B.     Punitive damages;

C.     Lost pay, including lost raises and bonuses;

D.     Front pay;

E.     Benefits;

F.     Interest;

G.     Attorney fees;

H.     Costs including expert fees;

I.     Injunctive relief, if applicable;

J.     Any and all other relief this Honorable Court deems just.

<u>**COUNT V**</u>
<u>**FEDERAL CLAIM - AGE DISCRIMINATION -**</u>
<u>**29 .S.C. 621 *ET. SEQ.* - AGE DISCRIMINATION IN EMPLOYMENT ACT**</u>

86.     Plaintiff re-alleges and incorporates her allegations set forth in ¶¶1 through ¶¶9, ¶17, ¶20, ¶21, ¶¶22 through ¶¶23, ¶26, ¶27, ¶31, ¶34, ¶38, ¶40 through ¶¶41, ¶¶43 through ¶¶47, ¶49, ¶50 and ¶¶52 through ¶¶57 hereof, as if fully set forth herein.

87.  At all material times hereto, Plaintiff was over the age of forty and is a covered employee as defined by the ADEA.

88.  At all times material hereto, Defendants have been doing business and is an employer with twenty or more employees for each work day for twenty or more calendar weeks in the current or preceding calendar years and within the meaning of the ADEA.

89.  At all times material hereto, Defendants were Plaintiff's employer as that term is defined by ADEA.

90.  From in or about fall 2006 and continuing until on or about her illegal termination, Defendants' younger management supervising Plaintiff took discriminatory actions against her due to her age, including, but not limited to, the following: 1) making negative comments about older people and needing to hire younger persons; 2) Treating Plaintiff in a condescending manner, rudely and disregarding Plaintiff's ideas and suggestions; 3) Removing classes from Plaintiffs; 4) Undermining Plaintiff's authority with her peers and students, including but not limited to, by holding meetings without Plaintiff, contradicting, disregarding and questioning Plaintiff's statements, directives or ideas, and subjecting Plaintiff to embarrassment; 5) Unfairly or falsely questioning Plaintiff's skills, including accusing her of having poor communication skills and employee relations; 8) Refusing to promote Plaintiff; 9) Hiring younger professors instead of Plaintiff, and 10) Refusing to inform Plaintiff of necessary information she needed to perform her job.

91.  Plaintiff was discriminated against on the basis of age.

92.     Defendants did not treat similarly situated employees who were significantly younger and/or who were under the age of forty similarly.

93.     Defendants' actions were willful and intentional and violated the ADEA.

        **WHEREFORE**, Plaintiff prays for a judgment against Defendants for the following damages:

      A.      Lost pay, including lost raises and bonuses;

      B.      Liquidated damages;

      C.      Benefits

      D.      Front pay;

      E.      Interest;

      F.      Attorney fees;

      G.      Costs including expert fees;

      H.      Injunctive relief, if appropriate; and

      I.      Any and all other relief this Honorable Court deems just.

**COUNT VI**
**STATE CLAIM – AGE DISCRIMINATION –**
**FLORIDA STATUTE §760, FLORIDA CIVIL RIGHTS ACT OF 1992**

94.     Plaintiff re-alleges and incorporates her allegations set forth in ¶¶1 through ¶¶9, ¶17, ¶20, ¶21, ¶¶22 through ¶¶23, ¶26, ¶27, ¶31, ¶34, ¶38, ¶40 through ¶¶41, ¶¶43 through ¶¶47, ¶49, ¶51, ¶¶52 through ¶¶57, ¶¶70 through ¶¶71, ¶¶75 through ¶¶76, ¶83, ¶90 and ¶92,   hereof, as if fully set forth herein.

95.     At all material times hereto, Plaintiff was over the age of forty and is a covered employee as defined by the FCRA.

96.    As described herein, from in or about fall 2006 and continuing until on or about Plaintiff's termination, Defendants, including by and through younger management supervising Plaintiff engaged in discriminatory actions against older employees such as Plaintiff and harassed them due to age, all in violation of the FCRA.

**WHEREFORE**, Plaintiff prays for a judgment against Defendants for the following damages:

*A.*    Compensatory damages, including damages for mental anguish, pain and suffering, emotional anguish and distress;

*B.*    Punitive damages;

*C.*    Lost pay, including lost raises and bonuses;

*D.*    Benefits;

*E.*    Front pay;

*F.*    Interest,

*G.*    Attorney fees;

*H.*    Costs including expert fees;

*I.*    Injunctive relief, if appropriate;

*J.*    Any and all other relief this Honorable Court deems just.

<u>**COUNT VII**</u>
<u>**FEDERAL CLAIM –GENDER**</u>
<u>**42 U.S.C.§2000e – TITLE VII**</u>

97.    Plaintiff re-alleges and incorporates her allegations set forth in ¶¶1 through ¶¶9, ¶17, ¶20, ¶21, ¶22, ¶¶25 through ¶¶26, ¶32, ¶34, ¶38, ¶40, ¶41, ¶43 through ¶¶47, ¶¶49 through ¶¶50, ¶52, ¶53, ¶¶54 through ¶¶57 and ¶83 hereof, as if fully set forth herein.

98.   At all material times hereto, Plaintiff was a covered employee as defined by Title VII.

99.   At all times material hereto, Defendants have been doing business and is an employer with fifteen or more employees for each work day for twenty or more calendar weeks in the current or preceding calendar years and within the meaning of Title VII.

100.  At all times material hereto, Defendants were Plaintiff's employer as that term is defined by Title VII.

101.  Plaintiff was discriminated against on the basis of gender/sex; reasonably believed she was discriminated against based on her gender, and a reasonable person would believe she was discriminated against based on gender.

102.  From in or about fall 2006 and continuing until on or about her illegal termination, Defendants' younger management supervising Plaintiff treated Plaintiff differently due to her gender, including, but not limited to, the following : 1) making comments about needing to hire male employees; 2) being called a girl; 3) being compared to fighting like teenage girls; 4) hiring less qualified males; 5) refusing to promote Plaintiff due to her gender; and 6)treating Plaintiff differently due to her gender, including allowing her to perform the work of overseeing the Psychology Department without the pay.

103.  Defendants did not treat similarly situated males similarly.

104.  Defendants' actions were willful and intentional and violated Title VII.

105.  Defendants' actions caused Plaintiff damages.

**WHEREFORE**, Plaintiff prays for a judgment against Defendants for the following damages:

A.      Compensatory damages, including damages for mental anguish, pain and suffering, emotional anguish and distress;

B.      Punitive damages;

C.      Lost pay, including lost raises and bonuses;

D.      Benefits;

E.      Front pay;

F.      Interest;

G.      Attorney fees;

H.      Costs including expert fees; and

I.      Any and all other relief this Honorable Court deems just.

## COUNT VIII
## STATE CLAIM –GENDER
## FLORIDA STATUTE §760, FLORIDA CIVIL RIGHTS ACT OF 1992

106.    Plaintiff re-alleges and incorporates her allegations set forth in ¶¶1 through ¶¶9, ¶17, ¶20, ¶22, ¶¶25 through ¶¶26, ¶32, ¶34, ¶38, ¶40, ¶41, ¶43 through ¶¶47, ¶49, ¶¶51 through ¶¶57, ¶¶70 through ¶ ¶72, ¶75, ¶76, ¶83, ¶¶101 through ¶¶ 103, and ¶105 hereof, as if fully set forth herein.

107.    Defendants' actions were willful and intentional and violated FCRA

**WHEREFORE,** Plaintiff prays for a judgment against Defendants for the following damages:

A.      Compensatory damages, including damages for mental anguish, pain and suffering, emotional anguish and distress;

B.      Punitive damages;

C.      Lost pay, including lost raises and bonuses;

D.      Front pay;

E.      Benefits;

F.      Interest;

G.      Attorney fees;

H.      Costs including expert fees;

I.      Injunctive relief, if applicable;

J.      Any and all other relief this Honorable Court deems just.

**COUNT IX**
**FEDERAL CLAIM -RETALIATION**
**42 .S.C.§12101 et. al - AMERICANS WITH DISABILITIES ACT**

108.    Plaintiff re-alleges and incorporates her allegations set forth in ¶¶1 through ¶¶13,

        ¶¶17 through ¶¶22, ¶24, ¶26 through ¶¶30, ¶33, ¶34, ¶¶35 through ¶¶42, ¶¶44 through

        ¶¶50, ¶52, ¶53, ¶¶54 through ¶¶57, ¶¶59 through ¶¶68, ¶73, ¶78, ¶¶79 through ¶¶83,

        and ¶105 hereof, as if fully set forth herein.

109.    Plaintiff's complaints to Defendant of discrimination, failure to reasonably

        accommodate, and/or retaliation is protected EEO activity.

110.    As a result of Plaintiff's complaints to Defendants of discrimination and failure to

        reasonably accommodate, Defendants retaliated against Plaintiff.

111.    Plaintiff's complaints to Defendants of discrimination and failure to provide

        reasonable accommodations are protected EEO activity.

112.    Plaintiff subjectively believed she was being discriminated against, and a reasonable

        person would have believed Defendants were discriminating against them.

113.   As a result of Plaintiff's complaints to Defendants of discrimination and failure to reasonably accommodate Defendants engaged in an escalating pattern of retaliatory actions against Plaintiff.

114.   As described herein, from in or about January 2008 and continuing until Plaintiff's termination and thereafter, Defendants took retaliatory actions against Plaintiff due to her engaging in EEO protected activity.

115.   Defendant' discriminatory actions against Plaintiff not only continued after she complained of discrimination and otherwise engaged in EEO protected activity, but such discrimination/hostile work environment and retaliation intensified.

116.   As described herein, Defendants took retaliatory actions against Plaintiff due to her engaging in EEO protected activity, including but not limited to the following actions: 1) Increasing the discriminatory actions taken against Plaintiff; 2) ignoring Plaintiff's recommendations and suggestions, and subjecting Plaintiff to embarrassment; 3) Scrutinizing Plaintiff's performance of activities and questioning her whereabouts and use of leave time, more closely than others and denying Plaintiff's leave requests; 4) Unfairly questioning Plaintiff's communication skills, including accusing Plaintiff of having poor communication and employee relations skills; 5) Ignoring Plaintiff, acting rudely and aggressively to Plaintiff, and reducing communications with Plaintiff unless necessary; Refusing to speak to Plaintiff unless work related and necessary; 6) Ostracizing Plaintiff; 7) Refusing to inform Plaintiff of necessary information Plaintiff needed to successfully perform her job and engaging in hostile comments and actions against Plaintiff; 8) Refusing to allow Plaintiff to

teach any overload classes; 9) holding classes/meetings on floors difficult for Plaintiff to attend due to her disability; 10) assigning Plaintiff classes she requested not to teach; 11)Refusing to renew Plaintiff's contract; 12) Terminating Plaintiff; 13) Refusing to transfer or allow Plaintiff to work at the Sarasota Campus, despite Sarasota indicating need and desire for Plaintiff; 14) Refusing to hire Plaintiff despite vacant positions; 15) Falsely informing persons that Plaintiff was terminated for failing to be meet accreditation requirements; and 16) Failing to appropriately investigate her EEO complaints.

117.    Defendants didn't treat employees who hadn't complained of discrimination similarly.

118.    Defendants' discriminatory actions against Plaintiff not only continued after she complained of discrimination and otherwise engaged in EEO protected activity, but such discrimination and hostile environment intensified.

119.    Defendants' actions violate the ADA.

120.    Defendants' actions have caused Plaintiff damages.

**WHEREFORE**, Plaintiff prays for a judgment against Defendants for the following damages:

A.    Compensatory damages, including damages for mental anguish, pain and suffering, emotional anguish and distress;

B.    Punitive damages;

C.    Lost pay, including lost raises and bonuses;

D.    Benefits;

E.      Front pay;

F.      Interest;

G.      Attorney fees;

H.      Costs including expert fees;

I.      Injunctive relief, if applicable, and

J.      Any and all other relief this Honorable Court deems just.

## COUNT X
## FEDERAL CLAIM -RETALIATION -
## U.S.C. §2000e – TITLE VII

121.    Plaintiff re-alleges and incorporates her allegations set forth in ¶¶1 through ¶¶9, ¶17 ¶19, ¶20, ¶22, ¶25, ¶26, ¶32, ¶¶34 through ¶¶41, ¶¶44 through ¶¶50, ¶¶52 through ¶¶57, ¶83, ¶¶98 through ¶¶105, ¶¶109 through ¶¶120, hereof, as if fully set forth herein.

122.    Plaintiff's complaint of discrimination to Defendants is protected activity as provided in Title VII.

**WHEREFORE,** Plaintiff prays for a judgment against Defendants for the following damages:

A.      Lost pay, including lost raises and bonuses;

B.      Front Pay;

C.      Punitive damages;

D.      Benefits;

E.      Interest;

F.      Attorney fees;

G.     Costs including expert fees;

H.     Injunctive relief, if applicable;

I.     Injunctive relief prohibiting Defendants from further retaliation, and

J.     Any and all other relief this Honorable Court deems just.

**COUNT XI**
**STATE CLAIM -RETALIATION – DISABILITY**
**FLORIDA STATUTE §760 - FLORIDA CIVIL RIGHTS ACT OF 1992**

123.    Plaintiff re-alleges and incorporates her allegations set forth in ¶¶1 through ¶¶22, ¶24, ¶26, ¶27, ¶28, ¶29, ¶30, ¶33, ¶¶34 through ¶¶42, ¶¶44 through ¶¶49, ¶¶51 through ¶¶57, ¶63, ¶¶64 through ¶¶67, ¶¶70 through ¶¶76, ¶¶78 through ¶¶81, ¶83, ¶85, ¶105, ¶¶107, ¶¶109 through ¶¶118 and ¶120 hereof, as if fully set forth herein.

124.    Plaintiff's complaints to Defendants of discrimination, is protected activity as provided in FCRA.

**WHEREFORE**, Plaintiff prays for a judgment against Defendants for the following damages:

A.     Compensatory damages, including damages for mental anguish, pain and suffering, emotional anguish and distress;

B.     Punitive damages;

C.     Lost pay, including lost raises and bonuses;

D.     Front pay;

E.     Benefits;

F.     Interest;

G.     Attorney fees;

H.     Costs including expert fees;

I.     Injunctive relief, if applicable, and

J.     Any and all other relief this Honorable Court deems just.

## COUNT XII
## STATE CLAIM -RETALIATION - GENDER
## FLORIDA STATUTE §760 - FLORIDA CIVIL RIGHTS ACT OF 1992

125.   Plaintiff re-alleges and incorporates her allegations set forth in ¶¶1 through ¶¶9, ¶17,

¶19, ¶20, ¶22, ¶25, ¶26, ¶32, ¶¶34 through ¶¶41, ¶¶43 through ¶¶49, ¶¶51 through

¶¶53, ¶56, ¶¶57, ¶¶70 through ¶¶72, ¶¶75 through ¶¶76, ¶83, ¶¶101 through ¶¶103,

¶105, ¶107, ¶¶109 through ¶¶118, ¶120 and ¶124 hereof, as if fully set forth herein.

**WHEREFORE**, Plaintiff prays for a judgment against Defendants for the following

damages:

A.     Compensatory damages, including damages for mental anguish, pain and
       suffering, emotional anguish and distress;

B.     Punitive damages;

C.     Lost pay, including lost raises and bonuses;

D.     Benefits;

E.     Front pay;

F.     Interest;

G.     Attorney fees;

H.     Costs including expert fees;

I.     Injunctive relief, if applicable, and

J.       Any and all other relief this Honorable Court deems just.

## REQUEST FOR JURY TRIAL

Plaintiff hereby requests a trial by Jury on all claims and issues so triable.

Dated December 16, 2010

Respectfully Submitted,

LISA A. ESPOSITO, ESQUIRE
Florida Bar No. 0959855
Law Offices of Lisa Esposito, P.A.
3606 W. Swann Ave
Tampa, Florida 33609
Telephone (813) 223-6037
Facsimile (813) 286-4132
Email lisa@lesposito.com
Attorney for Plaintiff

PAM OLSEN, ESQUIRE
Florida Bar No. 894117
Bogin Munns & Munns
1396 NE 20th Avenue Suite 440
Ocala, Florida 34470
Telephone (352) 690-7400
Facsimile (352) 690-6618
Email polsen@inmunns.com
Attorney for Plaintiff